UNITED STATES of America,
Plaintiff,

v.

Ana Nemecia OROZCO, Beatriz Muñoz–
Carrillo, Jose Martinez, Evaristo Or-
osco, Martha Orosco, Cynthia Orosco,
Defendants.

Criminal Case No. 07–cr–00275–EWN.

United States District Court,
D. Colorado.

July 17, 2008.

Donald R. Knight, Lisa Fine Moses, Knight & Moses, Littleton, CO, Peter R. Bornstein, Law Offices of Peter R. Bornstein, Thomas Francis Mulvahill, Chambers Dansky & Mulvahill LLC, Richard N. Stuckey, Richard N. Stuckey, Attorney at Law, P.C., Dana M. Casper, Casper and Rodarte, LLC, Denver, CO, for Defendants.

James R. Boma, U.S. Attorney's Office, Denver, CO, for Plaintiff.

## ORDER AND MEMORANDUM OF DECISION

EDWARD W. NOTTINGHAM, Chief Judge.

This is a criminal case in which various defendants stand accused of conspiring to traffic drugs and launder money in violation of various federal statutes. This matter comes before the court on: (1) Defendant Ana Nemecia Orozco's "Motion to Suppress Evidence Seized upon Search Warrant," filed January 18, 2008; (2) Defendant Beatriz Munoz–Carrillo's "Motion to Suppress Evidence Seized Pursuant to Search Warrant at 200 Clayton Street," filed April 30, 2008; (3) Defendant Jose Martinez's "Motion to Suppress Evidence Seized Pursuant to Search Warrant," filed January 26, 2008; (4) Defendant Evaristo Orosco's "Motion to Suppress Evidence Seized by Search Warrant," filed April 30, 2008; (5) Defendant Martha Orosco's "Motion to Suppress Items Seized by Search Warrant," filed January 18, 2008; and (6) Defendant Cynthia Orosco's "Motion to Suppress Items Seized by Search Warrant," filed April 30, 2008.

## FACTS

### 1. Factual Background

On October 9, 2007, the Government filed four separate applications before Magistrate Judge Craig B. Shaffer seeking warrants to search and seize property from four different addresses: (1) 11538 Nucla Street, Commerce City, Colorado ("11538 Nucla"); (2) 200 Clayton Street, Unit 200, Denver, Colorado ("200 Clayton"); (3) 5910 South Ogden Court, Centennial, Colorado ("5910 South Ogden"); and (4) 4080 West 48th Avenue South,

Denver, Colorado ("4080 West 48th"). (*See* Case No. 07–sw–05196–CBS–1, Dkt. No. 1; Case No. 07–sw–05201–CBS–1, Dkt. No. 1; Case No. 07–sw–05199–CBS–1, Dkt. No. 1; Case No. 07–sw–05197–CBS–1, Dkt. No. 1.) The Government simultaneously filed five additional applications for warrants to search properties not relevant to the instant motions. Each of the Government's applications was supported by an identical eighty-page affidavit sworn to by Drug Enforcement Administration ("DEA") Special Agent Albert Villasuso, and each requested to seize property listed in an identical five-page attachment entitled "Items to be Seized" (hereinafter "Attachment B"). (*See, e.g.,* Case No. 07–sw–05196–CBS–1, Dkt. No. 1 at 3–7, Ex. 1 [Villasuso Aff.].) The only material difference between the applications was a separate attachment to each containing a physical description and photograph of the real property to be searched. (*See, e.g.,* Case No. 07–sw–05196–CBS–1, Dkt. No. 1 at 2.)

On October 9, 2007, the magistrate judge issued warrants to search the four properties and seize the items listed in Attachment B. (*See* Case No. 07–sw–05196–CBS–1, Dkt. No. 2; Case No. 07–sw–05201–CBS–1, Dkt. No. 2; Case No. 07–sw–05199–CBS–1, Dkt. No. 2; Case No. 07–sw–05197–CBS–1, Dkt. No. 2.) On October 17, 2007, the Government searched the four properties, and on October 19, 2007, the Government returned the executed warrants. (*See* Case No. 07–sw–05196–CBS–1, Dkt. No. 5; Case No. 07–sw–05201–CBS–1, Dkt. No. 5; Case No. 07–sw–05199–CBS–1, Dkt. No. 5; Case No. 07–sw–05197–CBS–1, Dkt. No. 5.)

The instant motions seek to suppress evidence seized by the Government at the four addresses at which their respective movants resided at the time of the searches. Specifically, Defendants Evaristo, Martha, and Cynthia Orosco seek to suppress evidence seized at 11538 Nucla; Defendant Munoz–Carrillo seeks to suppress evidence seized at 200 Clayton; Defendant Ana Nemecia Orozco seeks to suppress evidence seized at 5910 South Ogden; and Defendant Martinez seeks to suppress evidence seized at 4080 West 48th. (*See* Mot. to Suppress Evidence Seized by Search Warrant [filed Apr. 30, 2008] [hereinafter "E. Orosco Br."]; Mot. to Suppress Items Seized by Search Warrant [filed Jan. 18, 2008] [hereinafter "M. Orosco Br."]; Mot. to Suppress Items Seized by Search Warrant [filed Apr. 30, 2008] [hereinafter "C. Orosco Br."]; Mot. to Suppress Evidence Seized Pursuant to Search Warrant at 200 Clayton Street [filed Apr. 30, 2008] [hereinafter "Munoz–Carrillo Br."]; Mot. to Suppress Evidence Seized upon Search Warrant [filed Jan. 18, 2008] [hereinafter "A. Orozco Br."]; Mot. to Suppress Evidence Seized Pursuant to Search Warrant [filed Jan. 16, 2008] [hereinafter "Martinez Br."].) Because each of the search warrant applications was based upon the same affidavit, and because each warrant permitted the seizure of identical items listed in Attachment B, I describe each of these two documents in turn.

### *a. Special Agent Villasuso's Affidavit*

Special Agent Villasuso's eighty-page affidavit submitted in support of each warrant application contained: (1) an untitled introduction; (2) a "summary of probable cause" as to each of the properties to be searched; (3) an "introduction" relating Special Agent Villasuso's knowledge of common drug trafficking and money laundering practices; (4) a "background" section describing the arrest of three individuals in January 2007, which led to the Government's investigation; (5) a summary of information obtained from two of these individuals, and from a third defendant in this case; (6) a summary of

information relating to various "shell" corporations associated with the alleged conspiracies; (7) a summary of bank account activity by various alleged conspirators; (8) a summary of tax returns prepared by various alleged conspirators; (9) a summary of travel information relating to various alleged conspirators; (10) a description of how various vehicles used in the alleged conspiracies were purchased; (11) a summary of surveillance conducted upon certain properties and alleged conspirators; and (12) a more specific description of the properties to be searched. (*See* Gov't's Notice of Filing of Aff. in Supp. of Search Warrants Obtained to Date in this Matter [filed May 20, 2008], Ex. 1 [Villasuso Aff.] [hereinafter "Villasuso Aff."].) I describe the relevant facts in each of these sections of the affidavit in turn.

### i. Untitled Introduction

The untitled introduction to the affidavit relates that Defendant Samuel Orozco operated an extensive cocaine distribution organization responsible for smuggling at least $15 million worth of cocaine from Mexico into the United States for distribution in Denver, Colorado, and Atlanta, Georgia. (Villasuso Aff. ¶ 1.) The introduction further relates that Defendant Samuel Orozco's drug trafficking organization ("DTO") included Defendants Evaristo and Martha Orosco, Munoz–Carrillo, Ana Nemecia Orozco, Martinez, and others not relevant to the instant motions. (*Id.*)

### ii. "Summary of Probable Cause"

The "summary of probable cause" section summarizes the probable cause to search each of the four relevant properties. (*Id.* ¶ 3[a]-[i].) This section relates, in identical language, that three of these properties—5910 South Ogden, 11538 Nucla, and 200 Clayton—were paid for "from proceeds of illegal drug trafficking," and that such proceeds were "laundered through various bank accounts ... to hide the true source of the funds." (*Id.* ¶¶ 3[a], 3[e], 3[f].) In addition, the summary relates

(1) with respect to 5910 South Ogden that: "[Defendant] Samuel Orozco's estranged wife, [Defendant] Ana Nemecia Orozco, continues to reside at this address and the investigation has shown that she continues to make structured currency deposits in a matter consistent with the laundering of [Defendant Samuel] Orozco's drug proceeds. This is also the listed business address for Northeast Clayton LLC that [Defendant] Samuel Orozco utilizes as a 'shell' corporation to make payments on [200 Clayton Street]," (*id.* ¶ 3[a] );

(2) with respect to 11538 Nucla that: "Surveillance recently observed that [Defendant Samuel] Orozco's Mercedes Benz CL 600 ... is being stored in the garage located at the rear of the property," (*id.* ¶ 3[e] ); and

(3) with respect to 200 Clayton that: "[Defendant Samuel] Orozco utilizes this residence to meet with members of his DTO [drug trafficking organization], as well as pay them for transporting loads of cocaine," (*id.* ¶ 3[f] ).

With respect to 4080 West 48th, the "summary of probable cause" relates in its entirety that:

The investigation has shown that this residence is occupied by [Defendant] [ ] Martinez, who previously resided at 740 South Harrison Street, Denver, Colorado at the same time that [Defendant Samuel] Orozco claims Samuel Enterprises Inc., an Orozco 'shell' corporation was allegedly operating at that address. This investigation has shown that [Defendant Samuel] Orozco has provided large amounts of currency to [Defendant] Martinez who has purchased several expensive vehicles with the registration and title listing his address as 740

South Harrison Street, Denver, Colorado.

(*Id.*, ¶ 3[h].) The summary represents that a fifth property—900 West 70th Place, Denver, Colorado ("900 West 70th")—is the residence of Defendant Munoz–Carrillo. (*Id.* ¶ 3[b].)

### iii. "Introduction"

The "introduction" section of the affidavit relates Special Agent Villasuso's knowledge of common drug trafficking procedures obtained through his training. (*Id.* ¶¶ 4–5.) This section provides a series of generalizations relating to drug trafficking practices, including: (1) "[d]rug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;" (2) "drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, electronic equipment used to store information and other papers relating to the transportation, ordering, sale and distribution of controlled substances;" and (3) "drug traffickers take or cause to be taken photographs of them, [sic] their associates, their property and their product and these traffickers usually maintain these photographs in their possession." (*Id.* ¶¶ 4[a], 4[e], 4[j].)

### iv. "Background"

The "background" section of the affidavit describes the January 2007 arrest of Wayne Montgomery and Daniel Valdez in Topeka, Kansas, with approximately twenty-four kilograms of cocaine concealed in their gas tank. (*Id.* ¶ 8.) This section describes a subsequent controlled delivery of this cocaine to Joseph Torrez in Denver, Colorado, and Mr. Torrez's subsequent arrest. (*Id.* ¶¶ 8–9.)

### v. Witness Information

The witness information contains summaries of information gleaned from interviews with Messrs. Torrez, Montgomery, and Benerito Marquez, Defendant Samuel Orozco's bodyguard who previously worked for Mr. Torrez. (*Id.* ¶¶ 12–62.) I describe each witness's relevant statements in turn.

### (a) Mr. Torrez

Mr. Torrez related that Defendant Samuel Orozco's DTO regularly transported cocaine from the latter's home in Juarez, Mexico, to Denver, Colorado, and Atlanta, Georgia. (*Id.* ¶ 12.) Mr. Torrez helped facilitate such transportation for approximately six or seven years by driving "load vehicles" containing concealed cocaine and/or money across the Texas–Mexico border, and then on to Denver. (*Id.* ¶¶ 12–15.) During such trips, Defendant Samuel Orozco would frequently assist in the "loading" of such vehicles in Mexico, and then fly to Denver to meet Mr. Torrez at 5910 South Ogden, where Mr. Torrez would drop off the load vehicles. (*Id.* ¶¶ 16, 18–19.) Mr. Torrez related that 5910 South Ogden was Defendant Samuel Orozco's residence. (*Id.* ¶ 23.)

Mr. Torrez claimed that Defendant Samuel Orozco told him to deposit his payments for such services into his bank account in deposits of less than $3,000 each to avoid suspicion. (*Id.* ¶ 27.) Mr. Torrez further described other money laundering techniques that Defendant Samuel Orozco taught him to disguise the proceeds of drug sales, including the endorsing over of checks to Defendant Samuel Orozco and the purchasing of vehicles in other peoples' names, even though Defendant Samuel Orozco retained the physical titles to such vehicles. (*See id.* ¶¶ 29–31.) Mr. Torrez further related that Defendant Samuel Orozco's company, Colorado Lending Group, was a front company used to launder money and broker loans for people associated with the DTO. (*Id.* ¶ 32.)

Mr. Torrez described Defendant Samuel Orozco's parents, Defendants Evaristo and Martha Orosco, as "blue collar workers" who worked as a truck driver and public school cook, respectively. (*Id.* ¶ 34.) He related that they both had modest incomes. (*Id.*) Mr. Torrez stated his belief that their current residence—11538 Nucla—was secretly financed by their son because, to Mr. Torrez's knowledge, the couple did not have the financial means to purchase the approximately $370,000 residence or pay the approximately $75,000 down payment. (*Id.*)

### (b) Mr. Montgomery

Mr. Montgomery related that he had become involved in the DTO in 2006 while working for a business owned by Mr. Torrez. (*Id.* ¶ 39.) Between 2006 and his arrest in January 2007, Mr. Montgomery made approximately eight to ten trips to Atlanta, Georgia, for Defendant Samuel Orozco in vehicles containing either money or drugs. (*Id.* ¶¶ 40–41.) Mr. Montgomery also drove load vehicles across the border from Mexico. (*Id.* ¶ 42.) Mr. Montgomery related that on January 15 or 16, 2007, he met with Defendant Samuel Orozco at the latter's residence at 200 Clayton, where Defendant Samuel Orozco paid him $6,000 in cash he was owed from an earlier trip. (*Id.* ¶¶ 47–48.) Defendant Samuel Orozco appeared to have other significant stores of cash at the residence at that time. (*Id.* ¶ 48.)

Like Mr. Torrez, Mr. Montgomery related that Defendant Samuel Orozco taught him how to avoid suspicion by depositing his money into multiple banks, using large banks, and making deposits of no more than $2,500 at any one time. (*Id.* ¶ 49.)

Mr. Montgomery believed that Defendant Samuel Orozco may have loaded vehicles with drugs and/or money at 5910 South Ogden because he would pick up vehicles from Defendant Samuel Orozco at a restaurant located near this address. (*Id.* ¶ 51.) Following Mr. Montgomery's arrest, Defendant Samuel Orozco instructed him to drop off all discovery material relating to his criminal case in the mailbox outside 200 Clayton. (*Id.* ¶ 54[d].) In May 2007, Defendant Samuel Orozco had Defendant Munoz–Carrillo leave Mr. Montgomery $4,000 at the customer service desk of the Cherry Creek Mall as part of an attempt to influence his cooperation with authorities. (*Id.* ¶ 54[g].) The Cherry Creek Mall is located several blocks from 200 Clayton. (*Id.*)

### (c) Mr. Marquez

Mr. Marquez related that he met Defendant Samuel Orozco through Mr. Torrez, and began working as his bodyguard. (*Id.* ¶ 55.) Mr. Marquez traveled to his residence in Juarez, Mexico, on at least six occasions to provide security for him. (*Id.*)

In March or April 2006, Mr. Marquez drove a Land Rover Discovery from Atlanta, Georgia, to Defendant Samuel Orozco's residence at 5910 South Ogden. (*Id.* ¶ 59.) Mr. Marquez believes this car was subsequently given to Defendant Munoz–Carrillo. (*Id.*) Sometime in January 2007, Mr. Marquez met with Defendant Samuel Orozco at 200 Clayton, and was informed that he was preparing to run or flee from any potential fall-out from the arrests of Messrs. Torrez and Montgomery. (*Id.* ¶ 62.)

### vi. "Shell" Corporations

The section of the affidavit pertaining to "shell" corporations relates that Defendant Samuel Orozco operated a number of sham or suspicious businesses: (1) G.O. Property Assets, Inc.; (2) Samuel Enterprises LLC; (3) Samuel Enterprises; (4) Historic Development LLC; (5) Northeast Clayton LLC; (6) Colorado Lending Group I, LLC; (7) Colorado Lending Group FHA

LLC; (8) PMIC; and (9) International Fruits, Inc. (*Id.* ¶ 63.) Relevant federal records provide no indication that International Fruits, Inc., Samuel Enterprises, Samuel Enterprises LLC, or PMIC ever imported or exported products or food items. (*Id.* ¶¶ 64–65.)

Bank loan information submitted by Defendants Samuel Orozco and Evaristo Orosco show that both men claimed to work for Samuel Enterprises, which they claimed was located at different addresses. (*Id.* ¶ 65.) For instance, Defendant Evaristo Orosco's September 2006 application for a loan to purchase 11538 Nucla states that he worked for Samuel Enterprises at 200 Clayton. (*Id.* ¶ 65[a].) Similarly, Defendant Samuel Orozco's April 2006 application for a loan to purchase 200 Clayton relates that he worked for Samuel Enterprises at 5910 South Ogden. (*Id.* ¶ 65[c].)

### vii. Bank Accounts

The bank account section of the affidavit represents that, based on records from over fifty accounts relating to members of the DTO, Defendants Evaristo, Martha, and Cynthia Orosco, Ana Nemecia Orozco, Munoz–Carrillo, and others not relevant to the instant motions cumulatively made over 1,300 currency deposits of amounts less than $10,000 each into accounts held by, or behalf of, Defendant Samuel Orozco between 2000 and 2007. (*Id.* ¶ 70.) Moreover, Special Agent Villasuso relates that, "[a] further review of these currency deposits shows that the technique prescribed by [Defendant Samuel] Orozco to [Messrs.] Montgomery and Torrez, of making deposits in increments of $3,000 or less, to avoid suspicion by banking officials or law enforcement, appears to have been followed in these deposits into these accounts." (*Id.*) Finally, the special agent represents that "investigators have seen a pattern of activity in these accounts whereby [Defendant Samuel] Orozco would transfer funds between his accounts [and those of the above-listed persons and entities] converting funds into checks, cashier's checks or bank checks, and then purchasing assets for himself or his DTO." (*Id.* ¶ 71.)

More specifically, this section summaries the account activity of three movants. I discuss such information in turn.

### (a) Defendant Ana Nemecia Orozco

Special Agent Villasuso provides a table listing nine deposits into Defendant Ana Nemecia Orozco's bank account from July to August 2005, each of either $2,800 or $2,900. (*Id.* ¶ 75.) This table lists one additional deposit in June 2006 of $75. The affidavit relates that a bank official told investigators that the bank had closed Defendant Ana Nemecia Orozco's account after seeing this pattern of activity, and that Defendant Ana Nemecia Orozco had advised the bank upon opening her account that she was an unemployed homemaker living at 5910 South Ogden. (*Id.*) The affidavit further relates that "[t]he United States Postal Inspection Service confirmed that postal records currently reflect that mail was being delivered to [Defendant Ana Nemecia Orozco] at 5910 South Ogden." (*Id.*)

### (b) Defendant Martha Orosco

Special Agent Villasuso relates that bank records reflect a $49,980 transfer in April 2006 from accounts held in the name of Defendant Samuel Orozco's Mexican girlfriend to Defendant Martha Orosco. (*Id.* ¶ 76.) Moreover, the special agent provides a table listing forty-eight currency deposits of between $1,000 and $2,800 each into Defendant Martha Orosco's Wells Fargo bank account between March 2006 and June 2007. (*Id.* ¶ 78.) The special agent relates that such deposits were made by "[Defendant Samuel] Orozco and his mother, [Defendant] Martha [Orosco]," but does not explain how he reached this

conclusion. (*Id.*) Similarly, the special agent provides a table listing thirteen deposits of exactly $2,000 each into Defendant Martha Orosco's Key Bank account between October 2006 and March 2007. (*Id.* ¶ 93.) The special agent relates that the latter deposits were made by "[Defendant] Martha Orosco." (*Id.* ¶ 93.)

The special agent also represents that Defendant Samuel Orozco made $11,000, $17,000, and $10,000 wire deposits into his mother's Wells Fargo account on January 23, 2007, January 23, 2006, and January 25, 2006, respectively. (*Id.* ¶ 79.) The affidavits states that expenditures from this account include: (1) $80,000 to Defendant Samuel Orozco in April 2006, which was used as part of the down payment on 200 Clayton; and (2) $10,000 in September 2006 as earnest money for, or a down payment on, 11538 Nucla. (*Id.* ¶¶ 80–83.) The special agent states that Defendant Martha Orosco's bank statements were delivered to 11538 Nucla. (*Id.* ¶ 77.)

#### (c) Defendant Cynthia Orosco

The affidavit provides a table listing fifteen deposits of between $1,000 and $2,000 each into the account of Defendant Samuel Orozco's sister, Defendant Cynthia Orosco, between May and September 2006. (*Id.* ¶ 91.) Although Special Agent Villasuso relates that such deposits were made by "[Defendants Samuel] Orozco and Cynthia [Orosco]," the table itself relates that only one of these deposits was made by Defendant Samuel Orozco, and does not list the source of the other deposits. (*See id.*) The expenditures from this account include a $21,000 check to Defendant Samuel Orozco issued in September 2006. (*Id.* ¶ 92.)

#### viii. Tax Returns

The tax return section of the affidavit represents that Defendants Ana Nemecia Orozco, Evaristo and Martha Orosco, and Munoz–Carrillo had only "minimal" reported income from 2000 to 2006. (*Id.* ¶ 94.)

Specifically, the tables included in this section of the affidavit represent that Defendant Ana Nemecia Orozco reported negative income from 2000 to 2002, $3,785 in income in 2003, and $48,547 in income in 2005. (*Id.* ¶ 95.) Defendant Munoz–Carrillo only filed a tax return in 2005, and reported negative income. (*Id.* ¶ 96.) Defendant Martha Orosco reported less than $9,000 annually from 2001 to 2005. (*Id.* ¶ 97.) Defendant Evaristo Orosco reported less than $15,000 annually from 2000 to 2005. (*Id.* ¶ 98.) Defendant Cynthia Orosco reported less than $28,000 annually from 2000 to 2005. (*Id.* ¶ 99.)

#### ix. Travel and Border Crossings

The only travel information relevant to any of the instant movants is Defendant Munoz–Carrillo's flight from Atlanta, Georgia, to Apodaca, Mexico, with Defendant Samuel Orozco around January 10, 2006. (*Id.* ¶ 103.)

#### x. Vehicle Purchases

The lengthy section of the affidavit pertaining to vehicle purchases describes the purchase of multiple vehicles over multiple years by members of the DTO. (*See id.* ¶¶ 106–35.) Although slightly unclear, the detailed descriptions of multiple vehicle purchases and transfers appears to be predicated upon showing how many of these vehicles were financed and/or controlled by Defendant Samuel Orozco, even though they were titled in other individuals' names. (*See id.*) The only vehicle purchase relevant to the instant motions relates to Defendant Martinez, and is indicative of the multiple transactions described in this section of the affidavit.

Special Agent Villasuso relates that in early March 2003, Defendant Martinez: (1) negotiated to purchase a vehicle from a dealership for roughly $62,500; (2) paid $7,000 in cash; (3) provided two trade-in vehicles worth $14,000 and $18,500; and

(4) financed the remainder of the purchase price. (*Id.* ¶ 114.) Subsequently, he paid the remainder of his debt to the dealership on three separate dates in March 2003, tendering cash in the respective amounts of $7,160, $8,000, and $7,500. (*Id.* ¶ 117.) In July 2006, Defendant Munoz–Carrillo— purportedly acting as Defendant Martinez's agent pursuant to a notarized "Power of Attorney for Motor Vehicles" form— transferred the title of this vehicle to herself for $20,000, and filed a "transfer of title request." (*Id.* ¶ 119.) Without drawing any explicit conclusions, Special Agent Villasuso further relates that Defendant Martinez's purported signature on the "Power of Attorney for Motor Vehicles" form appears to be forged. (*Id.* ¶ 118.)

### xi. Surveillance

The surveillance section contains only a few representations relevant to any of the searched properties or instant movants. For instance, in early August 2007, investigators saw Defendant Munoz–Carrillo deposit $2,500 in cash in a bank. (*Id.* ¶ 149.) In late August 2007, investigators watching her mother's house saw her place a manilla folder inside a large plastic bin in the trunk of her car; drive away to an unknown location, and later return as a passenger in a different car. (*Id.* ¶¶ 154– 55.) Finally, in late August 2007, investigators followed Defendant Martinez to a Sears store in a mall. (*Id.* ¶¶ 164–65.)

### xii. Description of the Properties to Be Searched

The final section of the affidavit contains a more detailed description of the properties to be searched, and various representations potentially relevant to the instant motions, to wit, that: (1) 5910 South Ogden is "occupied by [Defendants] Samuel[ ] Orozco [ ] and Ana Nemecia Orozco," as well as by Samuel Enterprises LLC and Samuel Enterprises; (2) Defendant Munoz–Carrillo resided at 900 West 70th; and

(3) 200 Clayton Street was occupied by Samuel Enterprises LLC, Samuel Enterprises, and Northeast Clayton LLC. (*Id.* ¶¶ 167[a]-[b], 167[f].)

### b. Attachment B

Attachment B to the affidavit, which lists the items to be seized and which was incorporated verbatim into the four search warrants, permits the seizure of: (1) controlled substances and related paraphernalia; (2) firearms; (3) currency and other assets; (4) telephone lists and address books; (5) paging and telephone devices; (6) mail and storage unit information; (7) bank account and financial records; (8) passports and travel documents; and (9) "drug records." (*See, e.g.,* Case No. 07– sw–05196–CBS–1, Dkt. No. 1 at 3–7 [hereinafter "Attachment B"].) Within these broad categories, Attachment B also lists nearly every item of property that could conceivably be present. For instance, the firearms category includes "handguns, revolvers, rifles, shotguns, machine guns and other weapons;" the currency category includes "financial instruments, precious metals, jewelry, and other items of value or proceeds of drug transactions;" and the financial records category includes over a full page of potential evidence, including:

> Evidence of income, obtaining, secreting, transferring, or the concealment of assets; or the secreting, transfer, concealment or expenditure of money including cash, precious metals, credit card receipts, wire transfers, money transfers, retained copies of Federal and State Tax Returns, journals, cash receipt books, cash disbursement books, expense records, business ledgers reflecting accounts and notes receiveables, accounts payables, notes payable and closing ledgers, bank ledger sheets, bank statements, bank correspondence, deposits and withdrawal tickets, cancelled checks,

loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans, records of any liens, loan correspondence files, bank memoranda, purchase invoices, copies of receipts covering payment of fees or expenses, copies of invoices and bills, records of real estate transactions, rentals, purchase or lease agreements for real or personal property, records of the acquisition or sale of vehicles, boats and aircraft, bank passbooks, money drafts, cashier's checks, bank checks, safes, briefcases, suitcases, storage boxes, safe deposit box records and keys, mutual and money market fund statements, stock or bond purchase records, ledgers, invoices and receipts, receipts or other records pertaining to wire transfers, receipts or other records pertaining to transactions within the United States or outside of the United States, including any foreign or off-shore accounts, investments, and trusts …

(*Id.*) The attachment also contains approximately one page listing all the electronic media in which relevant records could potentially be found, including:

Any magnetic, electronic or optical storage device capable of storing data, including but not limited to floppy disks, hard drives, tapes, CD–ROMs, CD–R, CR–RW's, DVD's, optical disks[,] printer or memory buffers, smart cards[,] PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, thumb drives, and memory sticks.

(*Id.*)

## 2. Procedural History

On January 16, 2008, Defendant Martinez moved to suppress evidence seized at 4080 West 48th because: (1) Special Agent Villasuso's affidavit fails to establish probable cause for the search; (2) the information used in the affidavit was stale; and (3) the warrant fails to meet constitutional restrictions against overbreadth and the use of general warrants. (Martinez Br.) On January 25, 2008, the Government responded. (Gov't's Consolidated Resp. to Def.'s Motions: [ … ] [2] to Suppress Evidence [filed Jan. 25, 2008] [hereinafter "Gov't's Martinez Resp."].)

On January 18, 2008, Defendant Ana Nemecia Orozco moved to suppress evidence seized at 5910 South Ogden because: (1) the information in the affidavit was stale as to that address and as to Defendant Ana Nemecia Orozco personally; (2) the affidavit omitted material facts; and (3) the warrant fails to meet constitutional restrictions against overbreadth and the use of general warrants. (A. Orozco Br.) On January 29, 2008, the Government responded. (Gov't's Consolidated Resp. to Def.'s Motions: [ … ] [1] to Suppress Evidence [filed Jan. 29, 2008] [hereinafter "Gov't's A. Orozco Resp."].)

On January 18, 2008, and April 30, 2008, Defendants Evaristo, Martha, and Cynthia Orosco moved to suppress evidence seized at 11538 Nucla because: (1) the affidavit failed to establish probable cause; (2) the warrant failed to meet constitutional restrictions against overbreadth and the use of general warrants; (3) the information in the affidavit was stale; and (4) the affidavit omitted material information. (M. Orosco Br.; E. Orosco Br.; C. Orosco Br.) On January 31, 2008, and on May 21 and 22, 2008, the Government responded. (Gov't's Consolidated Resp. to Def.'s Mots: [ … ] [3] to Suppress Items Seized by Search Warrant [filed Jan. 31, 2008] [hereinafter "Gov't's M. Orosco Resp."]; Gov't's Consolidated Resp: [ … ] [4] Mot. to Suppress Evidence Seized by Search Warrant

[filed May 22, 2008] [hereinafter "Gov't's E. Orosco Resp."]; Gov't's Resp. in Opp'n to Def.'s Mot. to Suppress Items Seized by Search Warrant [filed May 21, 2008] [hereinafter "Gov't's C. Orosco Resp."].)

On April 30, 2008, Defendant Munoz–Carrillo moved to suppress evidence seized at 200 Clayton because: (1) the warrant failed to meet constitutional restrictions against overbreadth and the use of general warrants; and (2) the warrant contained material omissions or mistakes. (Munoz–Carrillo Br.) On May 22, 2008, the Government responded. (Gov't's Consolidated Resp.: [...] [2] in Opp'n to Mot. to Suppress Evidence Seized Pursuant to Search Warrant at 200 Clayton Street [filed May 22, 2008] [hereinafter "Gov't's Munoz–Carrillo Resp."].) On June 3, 2008, Defendant Munoz–Carrillo replied. (Def. Carrillo's Consolidated Reply Re: Outstanding Motions [filed June 3, 2008] [hereinafter "Munoz–Carrillo Reply"].)

On July 1, 2008, I held a hearing in this matter. (*See generally* Courtroom Minutes [filed July 1, 2008] [hereinafter "Courtroom Minutes"].) At the hearing, the Government stated that it was relying upon the four-corners of Special Agent Villasuso's affidavit, and offered the agent for cross-examination upon his affidavit. (*See id.*) Upon cross-examination by Defendant Martha Orosco's counsel, Special Agent Villasuso acknowledged that the Government had seen no one getting into, out of, or driving the Mercedes Benz CL 600 observed at 11538 Nucla, but stated that the Government had previously observed documents being placed into the trunk of this vehicle at a different location. (*See id.*) Upon cross-examination by Defendant Cynthia Orosco's counsel, the special agent acknowledged that Mr. Torrez had stated in his interview that Defendants Samuel Orozco's immediate family was not aware of his illegal activities, and

that this statement was not included in the affidavit. (*See id.*) The special agent further acknowledged that the Government had no information that Defendant Cynthia Orosco's financial or tax records would be found at 11538 Nucla, because the Government did not know where she was living at the time of its warrant application. (*See id.*) Upon cross-examination by Defendant Ana Nemecia Orozco's counsel, the special agent acknowledged that Defendant Samuel Orozco had not been seen at 5910 South Ogden anytime in 2007, that the Government was aware he did not occupy that residence during 2007, and that the residence had been quitclaimed to Defendant Ana Nemecia Orozco in April 2006. (*See id.*) The special agent further acknowledged that the affidavit contained no specific information regarding when 5910 South Ogden had last been used for drug trafficking. (*See id.*) Upon examination by Defendant Munoz–Carrillo's counsel, Special Agent Villasuso acknowledged that the government seized multiple personal papers from her at 200 Clayton, where she was residing. (*See id.*)

## ANALYSIS

### 1. *11538 Nucla*

Defendants Evaristo, Martha, and Cynthia Orosco seek to suppress evidence obtained at 11538 Nucla. (*See* E. Orosco Br.; M. Orosco Br.; C. Orosco Br.) These defendants cumulatively argue that evidence seized at this address must be suppressed because: (1) the affidavit failed to establish probable cause; (2) the information in the affidavit was stale; (3) the affidavit omitted material information; and (4) the warrant failed to meet constitutional restrictions against overbreadth and the use of general warrants. (*See id.*) I assess each argument in turn, and then address whether the good-faith exception to the

exclusionary rule applies to cure any deficiencies in the affidavit or warrant.

### a. Probable Cause

■ "Probable cause for a search warrant requires 'facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir.2008) (citation omitted). "It is well-settled that for probable cause to exist there must be a nexus between the contraband to be seized or suspected criminal activity and the place to be searched." *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir.2005) (internal quotation marks and alteration omitted).

■ In the instant case, Defendants Evaristo, Martha, and Cynthia Orosco argue there was no probable cause to believe that contraband or evidence of any crime would be found at 11538 Nucla. (*See* E. Orosco Br. at 2–3; M. Orosco Br. at 2–4; C. Orosco Br. at 3–5.) The Government responds without elaboration that "[t]he affidavit contained sufficient information to establish probable cause," and suggested at the hearing that probable cause is demonstrated by the facts that: (1) Defendant Martha Orosco's bank statements were sent to 11538 Nucla; and (2) Defendant Munoz–Carrillo had been observed placing documents into the trunk of the Mercedes Benz CL 600, which was later observed at this address. (*See* Gov't's E. Orosoco Resp. at 7; Gov't's M. Orosoco Resp. at 9; Gov't's C. Orosco Resp. at 3; Courtroom Minutes.) For the following reasons, I agree with the defendants.

The affidavit contains remarkably little discussion of 11538 Nucla, or its alleged connection to the alleged drug trafficking or money laundering conspiracies. The "summary of probable cause" section recites that: (1) 11538 Nucla was purchased from drug trafficking proceeds; (2) such proceeds were laundered through various bank accounts; and (3) surveillance "recently" observed Defendant Samuel Orozco's Mercedes Benz CL 600 in the garage of this residence. (*See* Villasuso Aff. ¶ 3[e].) The witness information section of the affidavit relates Mr. Torrez's belief that 11538 Nucla was purchased with drug trafficking proceeds because Defendants Evaristo and Martha Orosco were "blue collar workers" who could not otherwise afford this residence. (*Id.* ¶ 34.) Bank loan information from September 2006 shows that Defendant Evaristo Orosco claimed to work for one of his son's sham businesses when he applied for funds to purchase 11538 Nucla in September 2006. (*Id.* ¶ 65[a].) The bank account section of the affidavit suggests that Defendants Martha and Cynthia Orosco engaged in suspicious banking activities, and that Defendant Martha Orosco's bank statements were delivered to 11538 Nucla. (*Id.,* ¶¶ 77–79, 80–83, 91–93.) The tax return section of the affidavit reflects that Defendants Evaristo, Martha, and Cynthia Orosco each reported modest incomes from 2000 to 2005. (*Id.* ¶¶ 97–99.)

While such evidence might suggest that 11538 Nucla was purchased with drug trafficking proceeds that had been laundered through various bank accounts, or that Defendants Evaristo, Martha, and Cynthia Orosco had engaged in money laundering, I find it would not "lead a prudent person to believe there is a fair probability contraband or evidence of a crime would be found" at this address. *Eidson*, 515 F.3d at 1146; *see also Gonzales*, 399 F.3d at 1228 (requiring a nexus between the contraband to be seized or the suspected criminal activity and the place to be searched). With respect to potential evidence of drug trafficking, no evidence suggests that Defendants Evaristo, Martha,

or Cynthia Orosco were involved in such activities, and no evidence suggests that 11538 Nucla was used for such purposes. No evidence links Defendant Samuel Orozco's Mercedes Benz CL 600 to such trafficking, and the affidavit merely indicates that this vehicle had been purchased with drug trafficking proceeds. (*See* Villasuso Aff. ¶¶ 108–13.) Special Agent Villasuso acknowledged at the hearing that the Government had seen no one getting into, out of, or driving the Mercedes Benz at 11538 Nucla. (*See* Courtroom Minutes.)

With respect to potential evidence of money laundering, the only information suggesting that such evidence might be present at 11538 Nucla is the fact that Defendant Martha Orosco's bank statements were delivered to this address, and her banking activity shows a pattern of suspicious behavior. (*See* Villasuso Aff. ¶¶ 77–79, 80–83, 93.) Nonetheless, without evidence that Defendant Martha Orosco kept inculpatory financial records at her residence, or that Defendants Evaristo or Cynthia Orosco kept similar records there, I find such evidence insufficient to "lead a prudent person to believe there is a fair probability that" evidence of money laundering would be found at this address. *Eidson*, 515 F.3d at 1146. The Government's theory appears to be that, because Defendants Evaristo, Martha, and Cynthia Orosco had engaged in suspicious banking activity, and because these defendants resided at 11538 Nucla, evidence of money laundering might be found at that address. While this contention is possible, it constitutes pure speculation, and I find it is at least as possible that Defendants Evaristo, Martha, and Cynthia Orosco would have kept any evidence of money laundering at some other location, or would have destroyed it altogether, particularly in light of Messrs. Montgomery's and Valdez's arrests in January 2007. Finally, the fact that the Government observed Defendant

Munoz–Carrillo, in August 2007, placing documents into the trunk of the Mercedes Benz which was later observed—on an unspecified date—at 11538 Nucla, is simply of no moment without evidence pertaining to: (1) the nature of these documents; (2) where the Mercedes Benz was located between these two sightings; and (3) whether such documents were ever removed from the Mercedes Benz and placed inside 11538 Nucla. In short, the affidavit provides virtually no reason to believe that evidence of drug trafficking or money laundering might be found inside 11538 Nucla, and I accordingly find that it fails to establish probable cause.

### b. Stale Evidence and Material Omissions from the Affidavit

Defendants Evaristo, Martha, and Cynthia Orosco next argue that any probable cause established by the above-cited evidence is vitiated because: (1) evidence pertaining to the purchase of 11538 Nucla dates to September 2006 and is stale; (2) evidence of Defendant Martha Orosco's suspicious banking activity terminates in June 2007 and is stale; (3) evidence of Defendant Cynthia Orosco's suspicious banking activity terminates in June 2006 and is stale; and (4) Special Agent Villasuso failed to relate Mr. Torrez's statement that Defendant Samuel Orozco's immediate family was not aware of his illegal activities. (*See* E. Orosco Br. at 3–4; M. Orosco Br. at 2–3; C. Orosco Br. at 4–5; Courtroom Minutes.) Because I find there was no probable cause to search 11538 Nucla, I decline to consider whether any evidence upon which probable cause may have been based was stale or vitiated by the omission of Mr. Torrez's statement.

### c. Overbreadth and the Use of General Warrants

■ The Fourth Amendment requires that warrants "particularly describ[e] the

place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment's particularity requirement ensures that search warrants are specific enough to prevent officers from "general, exploratory rummaging in a person's belongings." *United States v. Sears,* 191 Fed.Appx. 800, 806 (10th Cir. 2006) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 [1971] ). "A search warrant's description is sufficiently particular when it 'enables the searcher to reasonably ascertain and identify the things authorized to be seized.' " *Id.* (quoting *United States v. Leary,* 846 F.2d 592, 600 [10th Cir. 1988].) "The common theme of all descriptions of the particularity standard is that the warrant must allow the executing officer to distinguish between items that may and may not be seized." *Id.* (citation and internal quotation marks omitted).

■ In the instant case, Defendants Evaristo, Martha, and Cynthia Orosco also argue that the search warrant for 11538 Nucla was overbroad. (*See* E. Orosco Br. at 3–4; M. Orosco Br. at 1; C. Orosco Br. at 5.) The government does not respond to this argument. (*See* Gov't's E. Orosco Resp.; Gov't's M. Orosco Resp.; Gov't's C. Orosco Resp.) For the following reasons, I again agree with the defendants.

First, the search warrant, which incorporated Attachment B verbatim, contains multiple categories of seizable evidence that are only discussed in Special Agent Villasuso's description of common drug trafficking procedures. For instance, the warrant permitted the Government to seize certain drug paraphernalia, firearms, various assets, telephone lists and address books, passports and travel documents, and drug records, despite the fact that no evidence suggested such items existed, much less that they were located at 11538 Nucla. (*See* Attachment B.) I find a

search warrant permitting the seizure of evidence the Government surmises might exist based upon its assumption that suspects might be acting in accord with the general practices of criminals whose crimes they are suspected of emulating invites precisely the type of "general, exploratory rummaging in a person's belongings" that the particularity clause of the Fourth Amendment is intended to prevent. *Sears,* 191 Fed.Appx. at 806. Second, within these broad categories of seizable evidence that the Government had no information existed, and within other categories of seizable evidence that the Government *did* have some information existed— *e.g.,* bank account and financial records— the warrant provides no way for executing officers to distinguish between those items that were seizable, and those that were not. For instance, with respect to:

(1) firearms, the warrant permits the seizure of "handguns, pistols, revolvers, rifles, shotguns, machine guns, *and other weapons*;"

(2) currency and assets, the warrant permits the seizure of "currency, financial instruments, precious metals, jewelry, *and other items of value or proceeds of drug transactions*;" and

(3) bank account and financial records, the warrant permits the seizure of *"all financial records relating to the concealing of proceeds or the receipt, investment, or disbursement of proceeds."*

(*Id.* [emphasis added].) The Tenth Circuit has found warrants overbroad under far less egregious circumstances, as where a search warrant permitted the seizure of "any firearms," despite the fact that officers were specifically investigating a handgun crime, and has noted that "a warrant authorizing seizure of every single business record possessed by a business may be overbroad." *United States v. Jimenez,* 205 Fed.Appx. 656, 661–62 (10th Cir.2006);

*United States v. Le,* 173 F.3d 1258, 1274 (10th Cir.1999) (citation omitted). Moreover, I find this not a case in which the Government described evidence to be seized with as much particularity as was possible under circumstances because the warrant permitted the seizure of specific items the Government had no information existed, including "videotapes which indicate a criminal association between conspirators," "records for acquisition or sale of … aircraft," "briefcases," and "mutual and money market fund statements." (*See* Attachment B.) Third, the Government's execution of this warrant suggests that executing officers could not distinguish between items that could be seized, and those that could not. Special Agent Villasuso acknowledged at the hearing that executing officers apparently felt that the warrant permitted the seizure of Defendant Cynthia Orosco's financial documents at 11538 Nucla, even though the Government had not previously known that she resided at that address. (*See* Courtroom Minutes.) Similarly, Special Agent Villasuso failed to intelligibly answer Defendant Evaristo Orosco's counsel's question as to what type of evidence the Government could not seize pursuant to the warrant, and essentially agreed with this counsel's suggestion that the warrant permitted the searching of "everything and anything" that could be found at 11538 Nucla. (*See id.*) Finally, the facts that the warrant (1) did not designate whose financial records could be seized, (2) led the executing officers to believe they could seize records of a suspect they had not previously known resided at 11538 Nucla, and (3) was identical to eight other warrants issued for eight disparate properties, reinforces my conclusion that the warrant was of the nature of a general warrant. Based on the foregoing, I find that the search warrant for 11538 was constitutionally overbroad in

that it permitted a "general, exploratory rummaging" of Defendants Evaristo, Martha, and Cynthia Orosco's belongings, and failed to permit the executing officers to "distinguish between items that may and may not be seized." *Sears,* 191 Fed.Appx. at 806; *Leary,* 846 F.2d at 600.

### d. Good Faith Exception to the Exclusionary Rule

■ Having determined that the affidavit lacked probable cause and the warrant was constitutionally overbroad, I find that the evidence obtained from the Government's search of 11538 Nucla, and all fruits thereof, must be suppressed unless the good-faith exception to exclusionary rule applies. *See, e.g., United States v. Reed,* 195 Fed.Appx. 815, 824 (10th Cir.2006). In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court created the good-faith exception to this rule, holding that "evidence seized pursuant to a warrant issued by a neutral and detached magistrate judge later found invalid may still be admissible if the executing officer acted in objective good faith and with reasonable reliance on the warrant." *Id.* at 825 (citing *Leon,* 468 U.S. at 905, 922–23, 104 S.Ct. 3405).

■ In assessing whether to apply *Leon*'s good-faith exception, courts are confined to "the objectively ascertainable question of whether a reasonably well-trained officer would have known the search was illegal despite the issuing judge's authorization." *Id.* (citation and internal quotation marks omitted). In answering this question, the court must consider all the circumstances, and assume that executing officers had a reasonable knowledge of what the law prohibits, although not the knowledge attributable to lawyers. *Id.* "The government has the burden to show that its officers' reliance on the warrant was objectively reason-

able." *Id.* (citation omitted). Finally, "[a]lthough evidence seized pursuant to a warrant should only be suppressed in 'unusual circumstances,' the *Leon* Court recognized four situations in which an officer would not have reasonable grounds for believing a warrant was properly issued:

> (1) the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;
>
> (2) the issuing judge wholly abandoned his judicial role and failed to perform his neutral and detached role;
>
> (3) the affidavit issued to support the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
>
> (4) the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid."

*Id.* at 825–26 (citations omitted).

■ In the instant case, the Government claims *Leon*'s good-faith exception to the exclusionary rule applies to cure any deficiencies in the affidavit or warrant, but provides no argumentation on this point beyond conclusorily so stating. (*See* Gov't's E. Orosco Resp. at 15; M. Orosco Resp. at 9–10; C. Orosco Resp. at 4.) Similarly, the Government presented no evidence so demonstrating at the hearing, and offered virtually no argumentation on this point, beyond merely repeating its conclusory claim from its briefs. (*See* Courtroom Minutes.) I accordingly find the Government failed to carry its burden of demonstrating the objective reasonableness of the executing officers' reliance upon the warrant, and moreover note that the deterrent effect of the exclusionary rule would be served in this case by encouraging the Government to at least respond to defendants' arguments challenging the boilerplate nature of its warrants

with more than mere boilerplate recitations of law devoid of factual discussion or legal analysis. *Reed,* 195 Fed.Appx. at 824. More substantively, I also find three of the four exceptions to *Leon* apply in the instant case. First, the fact that the magistrate judge (1) issued nine identical warrants for the search of nine disparate properties on same exact day the Government applied for these warrants, and (2) incorporated by reference the Government's proffered list of identical items to be seized from each property, despite the facially overbroad nature of this list, and its utter disconnect from information showing that some categories of seizable evidence even existed, or that other categories might be found at the specific properties to be searched, suggests that the magistrate judge "failed to perform his neutral and detached role" of adequately reviewing these applications. *Reed,* 195 Fed.Appx. at 825. Second, the fact that, as indicated above, the affidavit provides virtually no indication evidence of either drug trafficking or money laundering might be found at 11538 Nucla—as opposed to evidence that the individuals residing there may have engaged in money laundering—suggests that it is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 825–26. Third, the fact that the warrant itself (1) provides virtually no way for the executing officers to distinguish evidence that is seizable from that which is not, (2) did not specify whose financial documents could be seized at 11538 Nucla, and (3) apparently led the executing officers to conclude that Defendant Cynthia Orosco's documents could be seized even though the Government had not previously known she resided at this address, suggests that the warrant was "so facially deficient" as to the requirement of particularity that the "executing officers

[could not have] reasonable presume[d] it to be valid." *Id.* at 826. Based on the foregoing, I find "a reasonably well-trained officer would have known the search was illegal despite the issuing judge's authorization," and thus that the good-faith exception to the exclusionary rule does not apply. *Id.* at 825.

### 2. *200 Clayton*

Defendant Munoz–Carrillo seeks to suppress evidence seized at 200 Clayton. (Munoz–Carrillo Br.) In her briefing and at the hearing, she argued broadly that: (1) the affidavit failed to establish probable cause; (2) information in the affidavit was stale; (3) the affidavit omitted material information and contained false information; and (4) the warrant failed to meet constitutional restrictions against overbreadth and the use of general warrants. (*See id.*; *see also* Courtroom Minutes.) To the extent not redundant of my above-analysis, I assess each argument in turn, and then address whether the good-faith exception to the exclusionary rule applies to cure any deficiencies in the affidavit or warrant.

### a. *Probable Cause, Stale Information, Material Omissions and False Representations*

■ "A search warrant may not issue if based upon information that has grown stale, *i.e.*, information that no longer supports an affidavit's underlying assertion that the item sought will be found in the area or location to be searched." *United States v. Cantu,* 405 F.3d 1173, 1177 (10th Cir.2005). "[W]hether the information is too stale to establish probable cause depends on the nature of the criminal activity, and the nature of the property to be seized." *Id.* (citation and internal quotation marks omitted). "When the circumstances suggest ongoing criminal activity, the passage of time recedes in importance." *Id.* (citation omitted).

At the hearing, Defendant Munoz–Carrillo argued broadly that: (1) the Government lacked probable cause to search 200 Clayton; (2) any probable cause was vitiated by stale evidence; and/or (3) any probable cause was vitiated by Special Agent Villasuso's failure to relate that she lived at 200 Clayton, and his representation that she lived at 900 West 70th. (*See* Courtroom Minutes.) For the following reasons, I agree.

Special Agent Villasuso's affidavit makes only scattered references to 200 Clayton or Defendant Munoz–Carrillo. The "summary of probable cause" section recites that: (1) 200 Clayton was purchased from drug trafficking proceeds; (2) such proceeds were laundered through various bank accounts; and (3) Defendant Samuel Orozco uses this residence to meet with members of the DTO and pay them for drug trafficking activities. (*See* Villasuso Aff. ¶ 3[f].) This section further recites that Defendant Munoz–Carrillo resides at a different address—900 West 70th. (*Id.* ¶ 3[b].) The witness information section of the affidavit recites that Mr. Montgomery met with Defendant Samuel Orozco at 200 Clayton in mid-January 2007, and saw significant stores of cash at this residence. (*Id.* ¶ 48.) Mr. Montgomery further reported that after his arrest, Defendant Samuel Orozco instructed him to drop off all discovery material in the mailbox outside 200 Clayton. (*Id.* ¶ 54[d].) Mr. Marquez stated that he met with Defendant Samuel Orozco at 200 Clayton in January 2007, where the latter was preparing to run or flee from any potential fall-out from the arrests of Messrs. Torrez and Montgomery. (*Id.* ¶¶ 59, 62.) Bank loan information shows that Defendant Evaristo Orosco listed 200 Clayton as the address of one of his son's sham businesses in a loan

application. (*Id.* ¶ 65[a].) Bank account information reflects that $80,000 in expenditures from Defendant Martha Orosco's bank account in April 2006 were put toward the down payment on 200 Clayton. (*Id.* ¶¶ 80, 82.) Tax return information reflects that Defendant Munoz–Carrillo reported negative income in 2005. (*Id.* ¶ 96.) The border crossing section of the affidavit states that Defendant Munoz–Carrillo flew with Defendant Samuel Orozco from the United States to Mexico in January 2006. (*Id.* ¶ 103.) The vehicle purchase section of the affidavit relates that in July 2006, Defendant Munoz–Carrillo participated in the re-titling of a vehicle purchased by Defendant Martinez in March 2003. (*Id.* ¶ 119.) In August 2007, surveillance saw Defendant Munoz–Carrillo deposit $2,500 in cash at a bank, and watched her place a manilla folder inside a large plastic bin in the trunk of her car at 900 West 70th Place and drive to an unknown location. (*Id.* ¶¶ 154–55.)

 While such evidence might support the conclusions that: (1) 200 Clayton was purchased with drug trafficking proceeds that had been laundered; (2) Defendant Munoz–Carrillo participated in money laundering and potentially in drug trafficking; (3) Defendant Samuel Orozco used 200 Clayton to meet with members of the DTO, store money, and receive legal papers; and (4) at least one member the DTO claimed 200 Clayton was the address of one of Defendant Samuel Orozco's sham businesses, I find that it would not "lead a prudent person to believe there is a fair probability contraband or evidence of a crime would be found" at this location. *Eidson,* 515 F.3d at 1146; *see also Gonzales,* 399 F.3d at 1228. With respect to potential evidence of drug trafficking, the only indication this address had been used for such purposes was Mr. Montgomery's statement that he received $6,000 at 200

Clayton in mid-January 2007, and saw other large stores of cash at that time. (*Id.* ¶ 48.) Nonetheless, Mr. Montgomery was arrested that same month, and his own statements demonstrate that Defendant Samuel Orozco was aware of his arrest, because the latter instructed him to drop off all discovery material relating to his criminal case in the mailbox outside 200 Clayton, and attempted to influence his cooperation with authorities in May 2007 by having Defendant Munoz–Carrillo drop off $4,000 at the customer service desk of the Cherry Creek Mall. (*Id.* ¶¶ 54[d], 54[g].) Similarly, Mr. Marquez reported that when he met with Defendant Samuel Orozco at 200 Clayton in January 2007, the latter was preparing to run or flee from any potential fall-out from the arrests of Messrs. Torrez and Montgomery. (*Id.* ¶ 62.) As such, I find that the Government's information that evidence of drug trafficking might be present at 200 Clayton was stale by October 2007, and that Mr. Montgomery's statements no longer supported the assertion that large stores of cash might be found at that address at that time. *See Cantu,* 405 F.3d at 1177.

 With respect to evidence of money laundering, the fact that 200 Clayton may have been purchased with drug trafficking proceeds that had been laundered, or that one member of the DTO listed this address as the location of one of Defendant Samuel Orozco's sham businesses, or that Defendant Samuel Orozco received legal papers at this address, simply provides no indication that evidence of money laundering might be found at 200 Clayton. Similarly, the fact that Defendant Munoz–Carrillo may have been involved in money laundering provides no indication that evidence of the same might be found at 200 Clayton, particularly in light of the fact that the Government did not even know that she resided at this address at the time of its

search, and believed that she resided at 900 West 70th. (*See id.* ¶ 3[b].) In short, for the reasons discussed more fully above, I find the Government's mere suspicion that evidence of money laundering might be found at 200 Clayton because this address was associated with Defendant Samuel Orozco insufficient to support probable cause.

Finally, I decline to consider whether the Government's omission of the fact that Defendant Munoz–Carrillo resided at 200 Clayton, or its false representation that she resided at 900 West 70th, might have vitiated any probable cause.

### b. Overbreadth, the Use of General Warrants, and the Good Faith Exception to the Exclusionary Rule

Defendant Munoz–Carrillo additionally argues the warrant to search 200 Clayton was constitutionally overbroad. (*See* Munoz–Carrillo Br. at 4.) For the all reasons cited above—*i.e.,* the inclusion of categories of evidence not discussed in the affidavit; the lack of meaningful criteria allowing executing officers to distinguish between those items that were seizable, and those that were not; and the executing officers' actual actions in executing the warrant—I find that this warrant was constitutionally overbroad. With respect to this third factor, I additionally note that the executing officers at 200 Clayton apparently felt the warrant permitted them to seize Defendant Munoz–Carrillo's financial records even though they did not know she resided at 200 Clayton at the time of the search. (*See* Courtroom Minutes.)

Finally, I also find that the good-faith exception to the exclusionary rule does not apply to cure deficiencies in the affidavit and warrant for the reasons cited above.

### 3. 5910 South Ogden

Defendant Ana Orozco moves to suppress evidence seized at 5910 South Ogden because: (1) the information in the affidavit was stale as to that address and as to her personally; (2) the affidavit omitted material facts; and (3) the warrant fails to meet constitutional restrictions against overbreadth and the use of general warrants. (*See* A. Orozco Br.) Again, to the extent not redundant of my above-analysis, I address each such argument in turn, and then assess whether the good-faith exception to the exclusionary rule applies.

### a. Probable Cause, Stale Information, Omission of Material Facts

Defendant Ana Nemecia Orozco argues that there was no probable cause to believe contraband or evidence of any crime would be found at 5910 South Ogden, primarily because the Government's information was stale. (*See* A. Orozco Br. at 3–4.) For the following reasons, I agree.

The affidavit provides only outdated or undated information relating to 5910 South Ogden. The "summary of probable cause" section recites that: (1) 5910 South Ogden was purchased from drug trafficking proceeds; (2) such proceeds were laundered through various bank accounts; (3) Defendant Ana Nemecia Orozco "continues" to make structured currency deposits in a manner consistent with laundering; and (4) 5910 South Ogden is the listed business address of one of Defendant Samuel Orozco's sham businesses. (*See* Villasuso Aff. ¶ 3[a].) The witness information section recites that Mr. Torrez dropped off load vehicles at 5910 South Ogden on various unspecified dates. (*Id.* ¶¶ 19, 23.) This section also recites that Mr. Montgomery picked up load vehicles from a restaurant near 5910 South Ogden on various unspecified dates, and that Mr. Marquez drove a load vehicle to this address in March or

April 2006. (*Id.* ¶¶ 51, 59.) Bank loan information shows that, in April 2006, Defendant Samuel Orozco listed 5910 South Ogden as the address of one of his sham businesses in a loan application. (*Id.* ¶ 65[c].) Bank account information demonstrates that Defendant Ana Nemecia engaged in suspicious banking activity from July to August 2005. (*Id.* ¶ 75.) Tax return information reflects that Defendant Ana Nemecia Orozco reported negative income from 2000 to 2002, $3,785 in income in 2003, and $48,547 in income in 2005. (*Id.* ¶ 95.) The description of the properties to be searched states that 5910 South Ogden is "occupied by [Defendant]s Samuel Everret Orozco [ ] and Ana Nemecia Orozco," as well as by Samuel Enterprises LLC and Samuel Enterprises. (*Id.* ¶ 167[a].)

■■■ While such evidence might support the conclusions that: (1) Defendant Ana Nemecia Orozco engaged in money laundering; (2) 5910 South Ogden had been used in drug trafficking; and (3) 5910 South Ogden had been listed as the address for one of Defendant Samuel Orozco's sham businesses, I find that it would not "lead a prudent person to believe there is a fair probability contraband or evidence of a crime would be found" at this location. *Eidson,* 515 F.3d at 1146; *see also Gonzales,* 399 F.3d at 1228. With respect to potential evidence of drug trafficking, the only information tying 5910 South Ogden to such trafficking at any specific time is Mr. Marquez's statement that he drove a load vehicle to this address in March or April 2006. (Villasuso Aff. ¶ 59.) By contrast, Messrs. Torrez's and Montgomery's statements provide no indication as to when they dropped off or picked up load vehicles at this residence. (*See id.* ¶¶ 19, 23, 51.) At the hearing, Special Agent Villasuso acknowledged that: (1) Defendant Samuel Orozco had not been ob-

served at 5910 South Ogden in 2007; (2) the Government was aware that he did not occupy this residence in 2007; and (3) the Government knew the residence had been quit-claimed to his estranged wife, Defendant Ana Nemecia Orozco, in April 2006. (*See* Courtroom Minutes.) The special agent further acknowledged that the affidavit contained no specific information relating to when 5910 South Ogden had last been used for drug trafficking. (*See id.*) As such, I find the Government's information that evidence of drug trafficking might be present at 5910 was stale by October 2007, and that the witnesses' statements no longer supported the assertion that evidence of such trafficking might be found at this address. (*Id.* ¶ 3[a].)

■■■ With respect to potential evidence of money laundering, the affidavit provides no information supporting the assertions that 5910 South Ogden was purchased with drug trafficking proceeds, or that Defendant Ana Nemecia Orozco "continues" to make structured currency deposits in a manner consistent with money laundering. (*See id.* ¶ 3[a].) Instead, Defendant Ana Nemecia Orozco's bank account merely shows suspicious activity from July to August 2005. (*Id.* ¶ 75.) Moreover, even if evidence of Defendant Ana Nemecia Orozco's suspicious banking activity had been more current, it would still not have suggested that evidence of money laundering would be found at 5910 South Ogden, for all the reasons indicated above. Similarly, the mere fact that this address was associated with one or more the sham businesses operated by Defendant Samuel Orozco provides no indication that evidence of money laundering might be found there. Accordingly, for the reasons discussed above, I find the information in the affidavit insufficient to support probable cause.

Finally, I decline to consider whether Special Agent Villasuso's knowingly false

representation that Defendant Samuel Orozco "occupied" 5910 South Ogden, and his omission of the fact that Defendant Samuel Orozco was no longer living with his estranged wife at this address, would have vitiated any probable cause. (*See id.* ¶ 167[a].)

### b. Overbreadth, the Use of General Warrants, and the Good Faith Exception to the Exclusionary Rule

Defendant Ana Nemecia Orozco additionally argues that the warrant to search 5910 South Ogden was constitutionally overbroad. (*See* A. Orozco Br. at 8–9.) For two of the three reasons cited above— *i.e.*, the inclusion of categories of evidence not discussed in the affidavit, and the lack of intelligible criteria permitting executing officers to distinguish between those items that were seizable, and those that were not—I find the warrant was constitutionally overbroad. I also find the good-faith exception to the exclusionary rule does not apply to cure the deficiencies in the affidavit and warrant for all the reasons cited above, and for the additional reason that Agent Villasuso's knowingly false representation that Defendant Samuel Orozco "occupied" 5910 South Ogden indicates "the issuing judge was misled by information in an affidavit that the affiant knew was false." *Reed,* 195 Fed.Appx. at 825.

### 4. 4080 West 48th

Defendant Martinez moves to suppress evidence seized at 4080 West 48th because: (1) the affidavit fails to establish probable; (2) information in the affidavit was stale; and (3) the warrant fails to meet constitutional restrictions against overbreadth and the use of general warrants. (Martinez Br.) I again briefly address each argument in turn.

### a. Probable Cause and Stale Information

 Defendant Martinez first argues that there was no probable cause to believe contraband or evidence of any crime would be found at 4080 West 48th. (*See* A. Orozco Br. at 3–4.) I agree.

The affidavit includes virtually no discussion of Defendant Martinez or 4080 West 48th, and the discussion it does provide gives no reason to believe that Defendant Martinez committed any crime, much less that evidence thereof might be found at 4080 West 48th. The "summary of probable cause" section of the affidavit recites that: (1) Defendant Martinez resides at 4080 West 48th; (2) he previously resided at a different address with Defendant Samuel Orozco; and (3) Defendant Samuel Orozco provided currency to Defendant Martinez to purchase vehicles and have them titled in Defendant Martinez's name. (Villasuso Aff. ¶ 3[h].) Despite these broad assertions, the section of the affidavit relating to vehicle purchases merely describes Defendant Martinez's purchasing of a vehicle in March 2003 with cash and two trade-in vehicles, and that Defendant Munoz–Carrillo subsequently purported to transfer title of this vehicle to herself pursuant to a "Power of Attorney for Motor Vehicles" form containing Defendant Martinez's forged signature. (*Id.* ¶¶ 114, 117–18.) The surveillance section of the affidavit recites that investigators followed Defendant Martinez to a Sears store in August 2007. (*Id.* ¶¶ 164–65.)

I find that such evidence would not "lead a prudent person to believe there is a fair probability contraband or evidence of a crime would be found" at 4080 West 48th. *Eidson,* 515 F.3d at 1146. No information in the affidavit suggests that Defendant Martinez was engaged in drug trafficking, and no information supports Special Agent Villasuso's claim that Defendant Martinez

purchased vehicles with money provided to him by Defendant Samuel Orozco. Instead, the affidavit merely describes Defendant Martinez's purchasing of a vehicle with cash and trade-in vehicles, but makes no effort to trace the source of the funds used in this transaction. (*See Villasuso Aff.* ¶¶ 114, 117–18.) Similarly, the fact that Defendant Munoz–Carrillo purported to retitle this vehicle in her own name pursuant to a form containing Defendant Martinez's forged signature, or that investigators followed Defendant Martinez to a Sears store in a mall, simply provides no indication that he was involved in any illegal activities, much less that evidence thereof might be found at 4080 West 48th. Stripped of its inclusion of irrelevant evidence, the Government's assertion appears to be that, because Defendant Martinez was somehow associated with Defendant Samuel Orozco, evidence of drug trafficking or money laundering might be found at his residence. I find this logic emblematic of much of the Government's reasoning in this case, and utterly insufficient to establish probable cause.

### b. Overbreadth, the Use of General Warrants, and the Good Faith Exception to the Exclusionary Rule

Defendant Martinez additionally argues that the warrant to search 4080 West 48th was constitutionally overbroad. (*See* A. Orozco Br. at 8–9.) For two of the reasons cited above with respect to 5910 South Ogden—*i.e.*, the inclusion of categories of evidence not discussed in the affidavit, and the lack of intelligible criteria allowing executing officers to distinguish between those items that were seizable, and those that were not—I agree, and find that the warrant was constitutionally overbroad. I also find that the good-faith exception to the exclusionary rule does not apply to cure deficiencies in the affidavit

and warrant for all the reasons cited above with respect to 11538 Nucla.

Based on the foregoing, I find that all evidence, and fruits thereof, seized from 11538 Nucla, 200 Clayton, 5910 South Ogden, and 4080 West 48th must be suppressed. The parties expressed some confusion at the hearing as to what evidence was seized from these addresses, but the Government represented it possessed information linking specific evidence to specific addresses, and that such information was available to the defendants. (*See* Courtroom Minutes.) The Government also indicated that one document seized at 200 Clayton—or at least a copy thereof—had been independently discovered pursuant to an administrative subpoena. (*See id.*) The Government is expected to provide an adequate foundation—including chain of custody evidence where applicable—for any evidence it seeks to admit at trial and that it claims derives from any source other than execution of the four instant warrants.

### 5. Conclusion

Based on the foregoing, it is therefore ORDERED that:

1. Defendant Evaristo Orosco's motion to suppress (# 540) is GRANTED;

2. Defendant Martha Orosco's motion to suppress (# 314) is GRANTED;

3. Defendant Cynthia Orosco's motion to suppress (# 544) is GRANTED;

4. Defendant Munoz–Carrillo's motion to suppress (# 547) is GRANTED;

5. Defendant Ana Nemecia Orosco's motion to suppress (# 316) is GRANTED; and

6. Defendant Martinez's motion to suppress (# 301) is GRANTED.

7. The court will hold a status conference in this case commencing at 3:15 o'clock p.m. on July 23, 2008, in

Courtroom A201, before Chief Judge Edward W. Nottingham.